H. WATSON DEVELOPMENT CO., INC., *et al.*, Plaintiffs-Appellants, *v.* THE BANK AND TRUST COMPANY OF ARLINGTON HEIGHTS, Defendant-Appellee.—THE BANK AND TRUST COMPANY OF ARLINGTON HEIGHTS, Plaintiff-Appellee, *v.* HUGH WATSON *et al.*, Defendants-Appellants.

First District (3rd Division)    No. 76-252

Opinion filed March 8, 1978.

Levin and Berger, of Chicago (Burton Berger and Arnold Malk, of counsel), for appellants.

Querrey, Harrow, Gulanick and Kennedy, Ltd., of Chicago (Donald C. Gancer, of counsel), for appellee.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

This appeal arises from two separate lawsuits. One suit was filed by the plaintiffs, H. Watson Development Company, Inc. (Watson Development) and Bartlett Valley Iron Works, Inc. (Bartlett Valley) against the defendant, The Bank and Trust Company of Arlington Heights

(the Bank), alleging that certain security agreements and notes, executed by the corporate officers, were obtained by the Bank in a fraudulent manner, and that the corporations never received any money or consideration following execution of the notes. The plaintiffs asked that the notes be cancelled and declared null and void, and requested monetary damages. During the course of the trial, it was learned that the Bank had obtained judgments by confession against Hugh and Katherine Watson on certain guaranties they had executed. A motion was made to vacate the confessed judgments. The court entered judgment for the defendant Bank in the one action and refused to vacate the confessed judgments against Hugh and Katherine Watson in the other. This appeal followed.

The plaintiffs, Watson Development and Bartlett Valley argue on appeal that the court erred in denying their petition for change of venue, that the judgment was against the manifest weight of the evidence; and that the execution of the notes and security agreements was an ultra vires action and therefore void. The defendants, Hugh and Katherine Watson argue that the guaranty executed by Katherine Watson was void for lack of consideration.

Hugh Watson first came into contact with the Bank in February 1972. He testified that he applied for a $350,000 mortgage on a parcel of real estate (the "Bartlett property") held in a land trust at the Bank and that the loan was approved by Robert Nelson, a Bank vice-president in the real estate department. Watson told Nelson that he would need interim financing to erect a building on the Bartlett property, and was advised that the Bank would be willing to finance the construction. Within six months, the Bank made a $78,000 loan to Watson secured by a mortgage on the Bartlett property. Watson testified he believed the loan would be increased to $350,000 when the buildings were completed on those premises.

The testimony of Robert Nelson and Donald Carrara, who was also a Bank vice-president in the commercial loan department at the time of these transactions, contradicts Watson. Nelson testified that he never made a commitment to Watson for a mortgage in the amount of $350,000 or any amount other than the $78,000 actually dispersed, although he did have many conversations regarding financing construction on the Bartlett property, none of which resulted in a commitment. Carrara testified that when he first met Watson in February 1972, he was seeking a $200,000 not $350,000 mortgage. He lent Watson $20,000, secured by the land trust, for "inter-financing purposes" in connection with construction on that property, but the $200,000 mortgage was declined by the real estate department. He stated that when advised of this, Watson said that he would attempt to obtain financing elsewhere and if necessary would

accept a lesser amount. The Bank then approved the $78,000 loan to Watson.

The notes in the bank's loan file on Watson indicate that the application for the $200,000 mortgage was declined on May 30, 1972; the entry for August 16, 1972, shows that a 10-year mortgage for $75,000 was approved and increased to $78,000 prior to disbursement on October 2, 1972.

Although Watson's initial contact with the Bank was with the real estate department regarding a mortgage on the Bartlett property, the notes from which this litigation arose were the result of transactions completed with the commercial loan department. Watson was in the business of acquiring real estate, constructing houses, and then selling the completed house. The Melrose & Maywood Savings & Loan Association normally provided the mortgage loan to the purchaser of the house, while the commercial loan department of the Bank provided interim financing to Watson for the acquisition of the property and construction. Watson testified that the actual construction was done by Watson Development, of which he owned all of the stock. He owned 62% of the stock of Bartlett Valley, which was in the business of structural steel fabrication, along with Donald Dobosz and Luther Garrett, each of whom owned 19%. In connection with these construction projects, a second land trust was opened at the Bank which took title to the lots under construction. The beneficial interest in this trust was used as additional collateral for the loans.

Carrara testified that throughout the early part of 1973, the loan relationship between the Bank and Watson was "quite good" and that he was a satisfactory customer with no problems. During this time, the Bank continued lending Watson money which served as interim financing for various construction projects, including the six loans in the amounts of $35,000, $20,000, $28,000, $45,000, $16,610 and $143,397.96, which totalled $288,007.96. Some of these, notably the $143,397.96 loan, consolidated other smaller loans made to Watson during the time period preceding the signing of the corporate notes in December 1973. However, in about August 1973, overdrafts began to appear on the accounts of both Bartlett Valley and Watson Development. This condition persisted with respect to both accounts as evidenced by their monthly bank statements through December 1973, when the complained of transactions occurred.

In September 1973 according to Watson's testimony, Watson approached the Bank in order to obtain financing for his two corporations, asking the Bank to issue $300,000 to each corporation so they could be properly capitalized to handle the business that was being generated. He was told by a Bank officer to bring in financial statements, accounts receivable, and the records of each corporation for the Bank to study before making any decision. Carrara testified that in late September 1973, he met with one of Watson's accountants, Gerald Catalano of Leaf,

Dahl & Company, and requested that he update the financial statements on Watson and his companies and determine what portion of the total loans to Watson had been channeled into Bartlett Valley and Watson Development.

On or about October 12, 1973, Carrara prepared security agreements for each of the corporations, covering furniture, fixtures, equipment, inventory, and assignment of all accounts receivable. These agreements were to secure the amount of $300,000, approximately the amount outstanding in loans to Watson. Watson testified that he was advised that the Bank would furnish each of his corporations a $300,000 line of credit, and that for this reason he had the proper officers of the two corporations execute the security agreements. Carrara, however, denied making any promises or commitments to Watson with respect to a line of credit, stating that in light of the overdraft situation, he had wanted additional security. The notes in Watson's loan file for October 12, 1973, state that regarding the security agreements, "it is our intention to segregate the advances which in the past had been made to Mr. Watson and funneled to Bartlett Valley and H. Watson Development. The advances will now be made on a direct basis to the respective corporations and we will then support each respective advance in turn by the pledge of adequate collateral."

On December 11, 1973, the two corporate notes were executed by Watson Development and Bartlett Valley. Watson testified that he was advised by the Bank that money was available for the corporations, and that he took the notes to the officers of the corporations and had them executed, advising the officers that they were going to receive the money they had requested. The note for Watson Development was in the amount of $160,007.96, and the note for Bartlett Valley was in the amount of $128,000. Watson stated that Carrara said he would give the corporations a $300,000 line of credit, but that Watson would have to personally guarantee it. Watson also stated that Carrara told him the loans had to be approved and could not be disbursed until February, and that of the $133,000 he had asked for Bartlett Valley, only $128,000 was available, and of the $179,000 he had requested for Watson Development, only $160,000 was available. On that same date, December 11, Watson's own personal notes were due, and he testified that he executed notes in the amounts of $160,007.96 and $128,000 to renew them. A few days later, Watson's wife, Katherine, was requested to execute a personal guaranty on the corporate notes, which she did.

Carrara testified that he requested that the two corporate notes be executed on December 11, 1973, as evidence of the obligations of Watson Development and Bartlett Valley to the Bank by virtue of the fact that the proceeds of the loans to Hugh Watson had been received by the two

corporations. Carrara stated that he believed that the corporations were "indirectly indebted" to the Bank, but the Bank had no documentation of this indebtedness. He testified that when he told Watson of his intentions, Watson acquiesced. The notation in the loan file for December 11, 1973, states that the purpose of the notes, due February 9, 1974, was "[c]on-solidation of all of Mr. Watson's obligations which total $288,007.96. * * * [T]he new obligations were a segregation of funds which we advanced to Mr. Watson personally and which he in turn advanced to the respective corporate entities referred to above [Bartlett Valley and Watson Development]." The Bank also had Watson and his wife Katherine, execute personal guaranties to make them secondarily liable.

On December 11, 1973, Watson had six notes due which totalled $288,007.96. The two corporate notes due February 9, 1974, converting these loans to direct liabilities of the two corporations, also totalled $288,007.96 (a $160,007.96 note from Watson Development, and a $128,000 note from Bartlett Valley). On the same date, Carrara also prepared two notes for Watson individually, in identical amounts and due the same date as the two corporate notes. Watson executed the two originals of the personal notes and left them with Carrara at the Bank. Carrara testified that he gave Watson the originals of the two corporate notes (the top parts of which, the security agreements, had been executed on October 12, 1973) to be signed by the proper officers of each corporation with the understanding that when they were returned to Carrara they would be substituted for Watson's personal notes. When the corporate notes were returned to him a few days later, Carrara either cancelled and returned to Watson the originals of his personal notes, or destroyed them. Carrara never "booked" Watson's two personal notes of December 11, 1973. Instead of taking them to the note teller for assignment of a loan number and preparation of a ledger card, he put them in a "pending drawer in the note cage" and no ledger sheet was made up.

All the parties agree that no money ever passed to the two corporations as a result of the transactions of October 12, 1973, and December 11, 1973. However, Carrara denied Watson's assertions that the Bank agreed to lend additional cash to the two corporations, denying that the Bank ever made any promise or commitment to make any additional loan proceeds available on the basis of the corporate notes, or that it promised any long term payout of the corporate notes which were due February 9, 1974.

On February 9, 1974, the due date of the two corporate notes, and also the due date of the two personal notes which according to Watson's testimony were outstanding and were to be merged into a new mortgage on this date, no payment of the indebtedness was made, nor was any payment ever made thereafter.

After December 11, 1973, the overdrafts on the corporate accounts

continued. John Freiberg, an executive vice-president at the Bank, testified that for the first time the Bank began to dishonor some of the checks. However, in February 1974, the Bank honored checks which were payable to the Internal Revenue Service, although they created overdrafts, since the IRS would begin proceedings immediately upon dishonor of a check which would have been detrimental to the corporations and to the Bank in collecting on the loans. Freiberg further testified that he contacted Watson immediately about the overdraft situation created by the payment of the IRS checks, and that on March 9, 1974, Watson executed a note in the name of Watson Development for $11,621.70 to cover the overdraft.

In May 1974, auditors for the corporations and Watson asked the Bank to confirm the obligations of their clients in connection with the preparation of updated financial statements. James Wyler, one of the Bank's internal auditors, prepared the answers requested. The confirmation showed no debt to the Bank from either corporation except for the note of March 9, 1974, in the amount of $11,621.70, and showed Watson personally indebted on two notes totalling $288,007.96 which were due February 9, 1974, and also on the real estate mortgage. Wyler testified that he was in error and if he had answered correctly, he would have shown the $160,007.96 due from Watson Development and $128,000 due from Bartlett Valley.

Randall C. Wolf, a vice-president at the Bank, testified regarding a meeting in May 1974 at which Watson was not present but which was attended by Sidney Edelstein, an attorney, and David Dahl, an accountant, on behalf of Watson and the two corporations, and Wolf, Freiberg and Stephen Jurco, a Bank attorney. The Bank requested new schedules of receivables and new financial statements of the corporations in order to determine what action might be necessary to collect on the notes. Dahl indicated to the Bank officials that the financial data the Bank had requested would show that there would be a source of repayment and that the corporations could pay back their loans. Both Edelstein and Dahl felt that if the Bank took legal action against the corporations on the notes it would be to the detriment of the corporations and that Bartlett Valley had sufficient receivables to warrant the Bank's continued cooperation. Neither Edelstein nor Dahl questioned the validity of either the corporate notes or the security agreements. During subsequent phone calls between Watson and Freiberg, Watson stated that there would be sufficient receivables to pay off the notes, that there was the possibility of getting a loan from another bank, and that he was also working on a loan from the Small Business Administration.

Under a cover letter dated June 4, 1974, Dahl submitted financial reports for each corporation for the year ending March 31, 1974. Despite

the confirmation from Wyler showing only $11,621.70 due from Watson Development and nothing due from Bartlett Valley, the reports, under "Current Liabilities," showed the exact amounts due as represented by the corporate notes executed December 11, 1973: $128,000 due from Bartlett Valley and $171,630 ($160,007.96 plus $11,621.70) due from Watson Development. The notations accompanying the reports recited that the loans were secured by security agreements giving a general assignment of inventory, accounts receivable, and property and equipment of the corporations.

In February 1975, Bank officers held a meeting with Watson, Dahl and Edelstein at which a proposal was made to settle the financial difficulties of Watson and the two corporations. The proposal was never carried out because of the existence of two other liens on the Bartlett property which had to be removed.

In March 1975 the Bank sent out notices of the assignment of accounts to contractors who had accounts payable to the two corporations which were covered by the security agreements stating that the corporations were in default on their loans and requesting payment directly to the Bank. This litigation followed. Proceedings were instituted by the two corporations to cancel the security agreements and notes. It was then discovered that in July 1974 the Bank had taken judgments by confession under the personal guaranties signed by Hugh and Katherine Watson to secure the corporate notes dated December 11, 1973.

On April 14, 1975, Watson Development and Bartlett Valley filed a complaint for injunction and damages. On April 23, the plaintiffs appeared before the trial court and presented a motion for a preliminary injunction. An order was entered giving the defendant five days in which to file an answer and continuing the hearing on the preliminary injunction to April 30, 1975. On April 30, the parties again appeared before the trial court on the motion for the preliminary injunction. An order was entered setting the case for trial on May 26, 1975. There is no transcript of what took place at either of these hearings.

On May 9, 1975, the plaintiffs appeared before the judge and presented a petition for change of venue, stating that: "This is a petition for change of venue. Your Honor has no time to hear this emergency matter and this has been continued to May 26th." The order denying the petition noted that "counsel for plaintiff having advised the court that his grounds for the motion were not prejudice of the judge but the need of the plaintiff for an early hearing on injunction," the petition was being denied for that reason.

The plaintiffs, Watson Development and Bartlett Valley, contend that their petition for a change of venue was improperly denied. The petition

came after two hearings on the plaintiffs' motion for a preliminary injunction. While there are no transcripts of those hearings, the record discloses that the court determined that the case was not an emergency matter, and set it for trial May 26, 1975. The report of proceedings for the May 9, 1975, hearing on the petition for change of venue reflects statements by the court and counsel for the Bank that at the previous hearings there was an extensive presentation to the court of the case, counsel for the plaintiffs explained his case "at great length," and the court had revealed its position with respect to the potential liability of a second defendant, the law firm representing the Bank, which was subsequently dismissed.

■■■ It is well settled that a petition for change of venue must be made at the earliest practicable moment, and once a party has determined the court's attitude on some portion of the merits of the case, the right to a change of venue no longer exists. (*Stavros v. Karkomi* (1973), 14 Ill. App. 3d 355, 302 N.E.2d 420; *Peck v. Rockford Life Insurance Co.* (1973), 9 Ill. App. 3d 568, 292 N.E.2d 528). In the case at bar, the petition did not come until after the plaintiffs' counsel had participated in a lengthy discussion of the matters at issue, during which the judge indicated his position on at least one of the issues. The subsequent request for a change of venue, therefore, came too late. *Joseph v. Joseph* (1973), 15 Ill. App. 3d 714, 718-19, 305 N.E.2d 19.

The plaintiffs next contend that the court's decision was against the manifest weight of the evidence. They argue that testimony and evidence overwhelmingly show that Hugh Watson and the two corporations, Watson Development and Bartlett Valley, and their officers, actually believed as a result of the Bank's actions that each of the corporations was going to receive a $300,000 line of credit, and that Watson would receive a long term end mortgage for the amounts he owed to the Bank. They assert that the Bank "conspired" to obtain additional collateral by luring Watson and the corporations into entering into security agreements and signing notes on the false promise of additional money. While the Bank's somewhat inexact handling of the matter is apparent, it does not change the fact that there is the sum of $288,007.96 representing actual cash advances made by the Bank, plus the advance of March 9, 1974 (less approximately $7,000 collected) plus interest, outstanding and owing to the Bank.

■■ As the court stated in *Steiner v. Rig-A-Jig Toy Co.* (1956), 10 Ill. App. 2d 410, 418, 135 N.E.2d 166:

> "A promissory note absolute on its face creates, in itself, the presumption that a debt is owing from the maker to the payee. [Citation.] This presumption is rebuttable. However, when such

presumption is strengthened and substantiated by the corporate records of the maker, the rebuttal evidence must be of a very clear and cogent nature, particularly when it is parol evidence."

Here, even though the Bank's confirmation to Watson's accountant apparently incorrectly reflected only the $11,621.70 note of March 9, 1974, due from either corporation, the financial statements of Watson Development and Bartlett Valley show the exact amounts due and owing to the Bank as represented by the corporate notes. At no time did Watson or his accountant or attorney demand a written commitment evidencing the "promised" extension of credit to the corporations, nor did anyone suggest that such money be deposited into the corporate accounts when overdrafts occurred and checks were being dishonored.

It was the conclusion of the trial court that the notes executed December 11, 1973, by the two corporations renewed the personal notes of Hugh Watson, due on that date, totalling exactly the same amount $288,007.96. While the plaintiffs argue that this finding is against the manifest weight of the evidence, we do not agree.

"It is a well-established rule, too familiar to need citations, that where a case is heard by the chancellor and the evidence is oral, entirely or in part, his decree will not be reversed unless it is against the manifest weight of the evidence, or unless there is clear and palpable error in some other respect. The trial court having heard and observed the witnesses is in a better position than is a court of review to decide what weight should be given their respective testimony." *Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365, 371, 247 N.E.2d 894.

■■ In the case at bar, there was sufficient documentary and testimonial evidence to support the court's finding. An opposite conclusion from that reached by the trial court is not clearly evident. The trial judge as the trier of fact was in a superior position to observe the conduct of the witnesses and judge their credibility, both weighing the evidence and determining the preponderance thereof. We find that the judgment of the trial court is not against the manifest weight of the evidence.

■■ The plaintiffs contend that the execution of the security agreements and notes was an ultra vires action by the corporations since the plaintiff corporations received no consideration for the execution nor was there proper corporate authorization to execute the notes and agreements assuming the individual obligations of Watson. We cannot agree. There was sufficient evidence before the court that the money borrowed by Watson was used for corporate purposes. While Watson Development and Bartlett Valley argue that they signed the notes because they thought they would receive "new" money—up to $300,000 in a line of

credit—there is abundant evidence in the record for the court to conclude that the security agreements and notes were executed in payment (renewal) of the six personal notes of Hugh Watson totalling $288,007.96, due on December 11, 1973, and therefore were supported by sufficient consideration.

"A renewal note is supported by a sufficient consideration either in the form of the consideration for the original instrument, the antecedent debt, the surrender of the original instrument, or the extension of time obtained by the renewal, and in some cases by the fact that the renewal embraces the compromise of a disputed claim in regard to the original. Similarly, where there is an exchange of paper or where a note is given in substitution for the note of another and the holder of the latter note surrenders it or extends the time for payment of the original obligation there is sufficient consideration for the new paper.

＊  ＊  ＊

It is not necessary to constitute consideration for a renewal note, or a new note executed in place of an existing one, that the old note be surrendered, cancelled, destroyed, or discharged. This is not called for as part of the consideration for the new note unless there is an express agreement therefor." 11 Am. Jur. 2d *Bills and Notes* §233 (1963). (See also *State Bank of Arthur v. Sentel* (1973), 10 Ill. App. 3d 86, 293 N.E.2d 444; Uniform Commercial Code section 3—408 and Uniform Commercial Code Comment 2 thereto, Ill. Ann. Stat., ch. 26, par. 3—408 (Smith-Hurd 1963); *First National Bank v. Achilli* (1973), 14 Ill. App. 3d 1, 301 N.E.2d 739.)

The consideration for the execution of the notes and security agreements was the antecedent debt of Watson, incurred when he borrowed funds from the Bank which were funnelled, almost exclusively, into the two corporations.

The plaintiffs also argue that the execution of the notes and security agreements was an ultra vires action because there was no proper corporate authorization. Citing section 72 of the Business Corporation Act (Ill. Rev. Stat. 1975, ch. 32, par. 157.72), which requires formal shareholder approval of a "sale, lease, exchange, mortgage, pledge, or other disposition of all, or substantially all, the property and assets, ＊ ＊ ＊ of a corporation, if not made in the usual and regular course of its business ＊ ＊ ＊," the plaintiffs argue that the actions of the officers in executing notes in payment of or as security for a personal· debt without formal shareholder approval were ultra vires and void. However, we find nothing in the record, nor do the plaintiffs cite any evidence in support of their argument that the actions were not "in the usual and regular course of business." Director resolutions authorizing corporate borrowing had

been obtained from both Watson Development and Bartlett Valley. Such authorization is all that is necessary when such mortgage, pledge or other disposition of corporate assets is made in the regular course of business. (Ill. Rev. Stat. 1975, ch. 32, par. 157.71.) In light of the fact that the plaintiffs' assertion that the transactions were not in the regular course of business is unsupported by any evidence, we cannot agree that the actions were ultra vires and void.

■■ Finally, the plaintiffs argue that the personal guaranty executed by Katherine Watson in connection with the December 11, 1973, transactions was void for lack of consideration. The Bank relies on *State Bank v. Sentel* (1973), 10 Ill. App. 3d 86, 91, 293 N.E.2d 444, where the court stated:

> "[W]here the wife is a co-maker of the note paying for the husband's obligations, there is consideration to the wife as she shares in his wealth and his inheritance. The extension of credit was made to her husband on the basis of her signature and she had a direct interest in the extension."

However, in the instant case, there is no evidence whatsoever that Katherine Watson's signature was a prerequisite to any extension of credit to either her husband or the two corporations; nor was she a co-maker of any of the previous notes executed. We agree that the personal guaranty of Katherine Watson is void for lack of consideration.

For the foregoing reasons, the judgment of the circuit court of Cook County in favor of the defendant, the Bank and Trust Company of Arlington Heights and against Watson Development and Bartlett Valley is affirmed.

The judgment by confession against Hugh Watson is affirmed. The judgment by confession against Katherine Watson is reversed.

Affirmed in part.

Reversed in part.

McNAMARA and McGILLICUDDY, JJ., concur.