**FORD MOTOR CREDIT COMPANY, a Delaware corporation, Plaintiff,**

v.

**DEVALK LINCOLN–MERCURY, INC., an Illinois Corp., et al., Defendant.**

No. 81 C 2132.

United States District Court, N.D. Illinois, E.D.

Jan. 25, 1985.

Aaron J. Kramer, Paul E. Dengel, Schiff Hardin & Waite, Chicago, Ill., for plaintiff.

Abraham Brustein, Dozoryst & Brustein, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

This action is before the Court on motion of plaintiff, Ford Motor Credit Corp. ("Ford Credit") for summary judgment. For the reasons set forth below, Ford Credit's motion is granted in part and denied in part.

### Facts

This action arises from agreements between Ford Credit and the defendants, De-Valk Lincoln-Mercury, Inc. (the "Dealership"), a Ford dealership, and four individuals, Harold G. DeValk, June DeValk, John M. Fitzgerald and Esther R. Fitzgerald. From the beginning of the Dealership's operation, Ford Credit provided financing for the Dealership's purchase of new and used vehicles, under the Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement ("Wholesale Financing Agreement"). Ford Credit also provided working capital to the Dealership pursuant to a Capital Loan Se-

curity Agreement ("Capital Loan Agreement").

Under the Wholesale Financing Agreement, Ford Credit advanced to the Dealership the purchase price for each vehicle the Dealership purchased for its inventory. In return, the Dealership was obligated to repay the amount advanced for each vehicle at or before the time of its sale to a customer. The Dealership agreed to pay Ford Credit interest on the outstanding amount of wholesale financing.

The DeValks and the Fitzgeralds also executed written guaranties to pay all debts of the Dealership owed to Ford Credit, dated March 10, 1977 and February 12, 1979.

On October 12, 1979, the Dealership voluntarily terminated its operations. On October 16, 1979 Ford Credit learned that the Dealership had sold five new vehicles without paying Ford Credit the money advanced to purchase the vehicles under the Wholesale Financing Agreement. Because of these "out of trust sales," Ford Credit declared the Dealership in default of both the Wholesale Financing Agreement and the Capital Loan Agreement. The assets of the Dealership were liquidated and the proceeds were applied against the Dealership's obligations. The automobile inventory was liquidated for approximately 94 percent of the principal amount owed under the Wholesale Financing Agreement.

In its complaint, Ford Credit claims that defendants owe the remaining principal and interest due under the Wholesale Financing Agreement, plus the principal and interest due under the Capital Loan Agreement. Ford Credit alleges, and the defendants admit, that Ford Credit has demanded payment by the individual defendants under their guaranties, and that such payment has been refused.

In Count I of its complaint, Ford Credit seeks recovery of amounts allegedly owed by the Dealership under both the Wholesale Financing Agreement and the Capital Loan Agreement. In Count II, Ford Credit seeks recovery of these same amounts under the written guaranties executed by the individual defendants. Ford Credit has moved for summary judgment on both counts.

## Summary Judgment

On a motion for summary judgment, the moving party has the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Cedillo v. International Association of Bridge and Structural Iron Workers*, 603 F.2d 7, 10 (7th Cir.1979). The nonmoving party is entitled to all reasonable inferences that can be made in its favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, the plaintiff may not merely rely on conclusory pleadings to withstand summary judgment. In responding to a motion for summary judgment, a plaintiff must set forth specific facts in affidavits or otherwise showing that there are genuine issues that must be decided at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983).

The purpose of the summary judgment procedure is to eliminate a trial in cases where a trial is unnecessary and results in delay and expense. *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir. 1972). As the Seventh Circuit Court of Appeals has noted, with the ever-increasing burden upon the judiciary, persuasive reasons exist for the utilization of summary judgment procedures whenever possible. *Kirk v. Home Indemnity Co.*, 431 F.2d 554, 559–60 (7th Cir.1970). Courts therefore will not strain to find the existence of a genuine issue where none exists. *Id.*

## Count I—The Dealership

Ford Credit has moved for summary judgment under Count I of the complaint, asserting that the Dealership does not dispute that it entered into and received funds pursuant to both the Wholesale Financing Agreement and the Capital Loan Agreement. The Dealership contends that several genuine issues of material fact exist that

preclude summary judgment against it.[1] First, it asserts that a genuine issue of material fact exists as to whether the parties agreed to the amount of wholesale credit to be extended and whether Ford Credit breached that agreement with the Dealership. The Dealership essentially contends that the parties in some manner agreed to a credit limit of $758,000, and that Ford Credit breached that agreement by allowing, pursuant to orders for new vehicles placed by the Dealership, the authorized financing to exceed $1.6 million.

The Wholesale Financing Agreement itself states no limit on the amount of financing permitted under the agreement. Instead, it explicitly grants Ford Credit the sole discretion to determine what, if any, limits on the extension of credit may be imposed under the agreement. Paragraph 1 of the agreement provides:

> Ford Credit at all times shall have the right in its sole discretion to determine the extent to which, the terms and conditions on which, and the period for which it will make advances to or on behalf of Dealer, or extend credit to Dealer, under the [Wholesale Financing Plan] or otherwise. Ford Credit, at any time and from time to time, in its sole discretion, may establish, rescind or change limits or the extent to which financing accommodations under the plan will be made available to Dealer. Ford Credit may pay to any manufacturer, distributor or other seller of merchandise the invoice amount therefor, and Ford Credit shall be fully protected in relying in good faith upon any invoice...

Despite this language, the Dealership asserts that a financing limit of $575,000 was established and that Ford Credit wrongfully allowed the Dealership's financing to exceed this limit. The Dealership contends that this "agreement" is evidenced by the preliminary negotiations of the parties and through the course of conduct of the parties in carrying out the Wholesale Financing Agreement. First, the Dealership maintains that, during the preliminary negotiations, the parties discussed a credit limit ranging between $375,000 and $600,000, and that prior to signing the agreement, Harold DeValk was notified that the credit limit of the Dealership was $575,000. DeValk Affidavit ¶ 7. The Dealership recognizes that the parol evidence rule operates to exclude evidence where the Court has found that the written agreement is clear and unambiguous. It argues, however, that parol evidence is admissible to allow the Court to determine whether there is, in fact, an ambiguity within the written document.

The Dealership relies on *Ortman v. Stanray Corp.*, 437 F.2d 231 (7th Cir.1971), in which the court stated that, "If relevant testimony concerning the circumstances surrounding the signing of a contract is offered, it should generally be heard." 437 F.2d at 234. However, the Seventh Circuit more recently reconsidered its interpretation of the Illinois parol evidence rule in *Sunstream Jet Express, Inc. v. International Air Service Co., Ltd.*, 734 F.2d 1258 (7th Cir.1984). In *Sunstream,* the court reversed its decision in *Ortman* to the extent that it required courts always to admit extrinsic evidence even where a contract is clear and unambiguous. The court held instead that, under Illinois law, parol evidence is admissible only if the court determines, as a matter of law, that the contract is ambiguous. 734 F.2d at 1267–68.

▆▆ In this case, the contract language quoted above is manifestly clear and unambiguous. It explicitly permits Ford Credit to unilaterally determine at any time the amount of credit to extend and to unilaterally change that amount at any time. The Court finds that, as a matter of law, this

---

1. The Dealership presented to the Court a motion to file an amended answer, which asserted five affirmative defenses. The Court withheld ruling on the motion to file an amended answer pending consideration of this motion for summary judgment. Upon review of the entire matter, since the Dealership asserts defenses previously raised by the individual defendants in the case, the amended answer does not substantially alter the basic issues in the case. The Court therefore grants the Dealership's motion to file an amended answer. The Court has considered the amended answer as filed for purposes of ruling on this motion for summary judgment.

language is clear and unambiguous, and that, therefore, evidence of pre-agreement discussions regarding credit limits are not admissible in evidence.

The Dealership also asserts that an agreement regarding a credit limit is established from the course of conduct of the parties after the agreement was entered. It details the various extensions of credit and "credit holds" imposed by Ford Credit on the Dealership. Nowhere, however, does the Dealership produce any evidence of a specific agreement by Ford Credit to alter the explicit terms of the Wholesale Financing Agreement by limiting the amount of authorized financing to a specific amount. Moreover, the various "credit holds" described by the Dealership do not evidence any subsequent modification of the written agreement, but instead demonstrate that Ford Credit was exercising its prerogative within the explicit terms of the written agreement to impose or modify any credit limit it deemed appropriate. Thus, the evidence of the parties' course of conduct after the agreement was entered shows that the parties acted within their terms of the written agreement, not that the parties in any way modified the written agreement. The Dealership has therefore failed to raise any genuine issue of material fact, either through pre-agreement negotiations or post-agreement conduct, regarding any agreement to a specific credit limit which could have been breached by Ford Credit.

The Dealership next argues that Ford Credit is not entitled to summary judgment on Count I because a genuine issue of material fact exists as to whether Ford Credit liquidated the collateral in a commercially reasonable manner. It asserts that Ford Credit delayed in returning new cars and in collecting amounts due on warranty claims and parts returned, and sold the nonreturnable cars at auction rather than at retail. The Dealership maintains that Ford Credit, as a secured party under the Wholesale Financing Agreement and the capital loan agreement, had an obligation under Section 9–504 of the Illinois Uniform Commercial Code ("IUCC"), Ill.Rev. Stat. ch. 26, § 9–504, to liquidate the collateral in a commercially reasonable manner.

■ However, the Dealership's objection that the cars were sold at auction rather than at retail fails to raise a genuine issue of material fact regarding the commercial reasonability of the liquidation of the collateral. § 9–507(2) of the IUCC provides:

The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in any recognized market therefore.... he has sold in a commercially reasonable manner.

Ill.Rev.Stat., ch. 26, § 9–507(2). Thus, that Ford Credit may have been able to obtain a higher price for the collateral if it had sold it in a different manner does not alone establish that the sales were not commercially reasonable. The Dealership has failed to produce any other evidence to show that the auction sales were not commercially reasonable. Moreover, Ford Credit has produced uncontradicted evidence that the auction at which the cars were sold, which only retail automobile dealers may attend, is a well-recognized market for automobiles in the Chicago metropolitan area. La Mantra Affidavit ¶ 4. Under § 9–507(2) and this unchallenged evidence, the Court must find that the Dealership has failed to raise a genuine issue of material fact regarding the commercial reasonableness of the auction sale.

In addition, § 9–501(3)(b) of the IUCC permits the parties to determine by agreement the standards by which the fulfillment of the duty to sell in a commercially reasonable manner is to be measured, as long as the agreement is not manifestly unreasonable. Ford Credit and the Dealership made such an agreement in paragraph 9 of the Wholesale Financing Agreement, which provides:

Dealership further agrees that if Ford Credit shall solicit bids from three or more other dealers in the type of proper-

ty repossessed by Ford Credit hereunder, any sale by Ford Credit of such property in bulk or in parcels to the bidder submitting the highest cash bid therefor also shall be deemed to be a commercially reasonable means of disposing the same. Ford Credit has provided evidence that approximately 150 automobile dealers attended the auction at which the vehicles were sold and were invited to submit bids. La Mantra Affidavit ¶ 3. The Dealership has produced no evidence to the contrary, or that the agreement in Paragraph 9 was manifestly unreasonable. The Court must therefore conclude under § 9–501(3)(b), as well as § 9–507(2), the Dealership has failed to raise a genuine issue of material fact regarding the reasonableness of the auction sale, and that the sale was therefore commercially reasonable.

With regard to the Dealership's argument that Ford Credit delayed in liquidating the collateral, the Dealership has presented absolutely no evidence to show that Ford Credit acted unreasonably in this regard. The Dealership has therefore failed to raise a genuine issue of material fact on this point as well.

The Dealership next argues that Ford Credit agreed that the liquidation would be conducted with the mutual benefit of the parties. The Dealership contends that a genuine issue of material fact exists as to whether this agreement was breached. However, the Dealership offers no evidence to prove that Ford Credit made any "agreement" with the Dealership to liquidate in a mutually beneficial manner. The Dealership cites no evidence in its brief to support the existence of such an agreement. A review of defendants' affidavits revealed that Harold DeValk stated only that "Mr. Plumboff stated that Ford Credit would show, by its cooperation in the liquidation process, that it intended to conduct the liquidation for the mutual benefit of all the parties concerned." DeValk Affidavit ¶ 22. This statement does not evidence an agreement between the parties enforceable by the Dealership, but at most is a statement of Ford Credit's intention within the parameters of its already existing contractual rights. Moreover, the Dealership failed to allege or present any evidence of consideration to Ford Credit to support any such agreement. The Court therefore finds that the Dealership has failed to raise a genuine issue of material fact with respect to any enforceable agreement by Ford Credit to liquidate the collateral in a manner mutually beneficial to both parties.

■ The only remaining issue raised by the Dealership is whether Ford Credit has failed to collect amounts allegedly due the dealership from Ford Motor Co., which the Dealership claims amounts to approximately $11,000. The Dealership apparently contends that this amount should be set off against the Dealership's indebtedness under the Wholesale Financing Agreement and the Capital Loan Agreement. Since neither party has provided sufficient evidence on this matter to permit resolution on summary judgment, this question remains as an issue of fact. Ford Credit's motion for summary judgment is therefore denied at this time with respect to this one affirmative defense only.

■ Accordingly, since the Dealership has failed to raise any genuine issue of fact regarding its liability under Count I, except as discussed above, the Court grants Ford Credit's motion for summary judgment on Count I on all issues except with respect to the Dealership's First Affirmative Defense relating to accounts receivable allegedly due from Ford Motor Co.

### Count II—The Guaranties

In Count II of its complaint, Ford Credit seeks recovery from the individual defendants who guaranteed the Dealership's debts to Ford Credit. These guarantors, Harold G. DeValk, June DeValk, John M. Fitzgerald and Esther K. Fitzgerald, each admit they executed personal guaranties in connection with the Wholesale Financing Agreement and the Capital Loan Agreement. Ford Credit asserts, and the guarantors do not contest, that the guaranties are unconditional guaranties of payment of all the debts of the dealership owed to Ford Credit.

■ In opposition to the motion for summary judgment, the guarantors first assert the defenses raised by the dealership, that Ford Credit overextended the Dealership's credit limit and failed to dispose of the collateral in a commercially reasonable manner. As discussed above with respect to Count I, no genuine issue of material fact has been raised relating to either of these matters. First, as noted above, Ford Credit was fully within its contractual rights in unilaterally setting and changing the Dealership's credit limit.[2] Second, with respect to the liquidation of the collateral, not only has no genuine issue of fact been raised as to the commercial reasonableness of Ford Credit's action, but, the individual guarantors each agreed in their guaranties to pay the debts of the Dealership upon default "without [Ford Credit] first having to proceed against the [Dealership] to liquidate paper or security therefor." Exhibits 5 & 6 to Ford Credit's Motion, ¶ 1. Thus, the guarantors have explicitly waived any right to have Ford Credit pursue the collateral in any manner before collecting from the guarantors. The individual guarantors therefore may not rely on either of these defenses of the Dealership in opposing Ford Credit's motion for summary judgment.

The guarantors also assert that there is a genuine issue of fact as to whether their guaranties were supported by consideration. They apparently argue that, because the guaranties were executed on the dates after the primary agreements between the Dealership and Ford Credit, they require new and additional consideration. *First National Bank of Redbud v. Chapman,* 51 Ill.App.3d 738, 9 Ill.Dec. 426, 366 N.E.2d 937 (1977). They note that the DeValks signed their guaranties two days after they signed the Wholesale Financing Agreement, and that the Fitzgeralds executed their guaranties nearly two years after the original agreements were entered with the Dealership.

■ However, both Harold DeValk and John Fitzgerald admit in their answers that they executed their guaranties for good and valuable consideration. Harold DeValk admitted he executed his guaranties for good and valuable consideration and to induce Ford Credit into the Wholesale Financing Agreement and the Capital Loan Agreement. Both Harold DeValk and John Fitzgerald admit in their answers that they signed their guaranties to induce Ford Credit to extend both agreements. In light of these admissions, neither of these guarantors now assert the defense of lack of consideration.

■ Further analysis is required, however, with respect to June DeValk and Esther Fitzgerald, who did not make similar admissions in their answers. As noted by the guarantors, a guaranty not executed contemporaneously with the agreement that purportedly provides the consideration for the guaranty may require new consideration. *First National Bank of Red Bud v. Chapman,* 366 N.E.2d 937, 940 (1977). Ford Credit has submitted an affidavit in which Mr. Plumboff, Ford Credit's manager in charge of the Dealership's financing, affirmatively states that the loan agreements were entered into and extended in reliance upon all four guaranties. No counter-affidavits or other evidence have been provided by June DeValk or Esther Fitzgerald to contest or deny that the continued extension of the loan agreements constituted the consideration for their guaranties. Although the guaranties may not have been signed on the exact dates various credit was extended to the Dealership, the loan agreements (and the guaranties) were all terminable at will by either party with notice to the other party. Ford Credit therefore could have terminated the loan agreements at any time had the guarantors refused to sign the guaranties, making the continued provision of credit even after the agreements were extended in

---

**2.** The guarantors also argue that the alleged overextension of credit by Ford Credit changed the nature of the principal obligation and that the guarantors are therefore discharged. However, since the Court has found that Ford Credit acted within its original contractual rights in extending the credit limit, there has been no alteration of the nature of the principal obligation. The guarantors' argument in this regard is therefore without merit.

writing sufficient consideration for the guaranties. Since June DeValk and Esther Fitzgerald have failed to present any evidence tending to prove that the continuing extension of credit to the dealership was not consideration for the guaranties, they have failed to raise a genuine issue of material fact regarding the sufficiency of consideration for the guaranties on this basis.

■ Esther Fitzgerald makes two additional arguments with respect to her guaranty. First, Mrs. Fitzgerald asserts that she has no liability under the Capital Loan Agreement. She argues that Ford Credit required the DeValks to sign separate guaranties with respect to the Wholesale Financing Agreement and the Capital Loan Agreement, and that a new guaranty was required each time the capital loan agreement was extended. The Fitzgeralds were required to sign a guaranty when John Fitzgerald made a significant capital contribution to the Dealership. However, three weeks later, when the Capital Loan Agreement was extended, a new guaranty was executed by the DeValks and John Fitzgerald, but not by Esther Fitzgerald. She therefore argues that she never undertook to guaranty the obligations of the Dealership with respect to the Capital Loan Agreement. However, it is clear from the unambiguous language of her guaranty that Mrs. Fitzgerald undertook to guaranty *all* present and future obligations of the dealership to Ford Credit until termination of the guaranty. Mrs. Fitzgerald admits that she has not at any time terminated the guaranty. In light of this explicit language, the Court must conclude that Mrs. Fitzgerald has not raised a genuine issue of material fact in this regard, and that her guaranty must apply to all obligations of the Dealership to Ford Credit, including the Capital Loan Agreement.

■ Esther Fitzgerald's second argument is that there is a genuine question of material fact as to whether Ford Credit ever intended to obtain a guaranty from her. As evidence, she points to an internal memorandum by a manager at Ford Credit, which stated that a guaranty from John Fitzgerald would be required, but did not mention Esther Fitzgerald. She also asserts that she was not required to sign a March 7, 1979 extension of the Capital Loan Agreement, and that the guaranty form does not have a typewritten line for her signature. She relies on *H. Watson Development Corp. v. Bank and Trust of Arlington Hts.*, 58 Ill.App.3d 423, 15 Ill. Dec. 984, 992, 374 N.E.2d 767, 775 (1978). In *H. Watson*, the court held that, where there was no evidence whatsoever that the signature of the wife of a corporate officer was the prerequisite to an extension of credit to her husband's corporation, the guaranty was void for lack of consideration. As the court also noted, however, that:

> "Where the wife is a comaker of the note paying for the husband's obligations, there is consideration to the wife as she shares in his wealth and his inheritance. The extension of credit was made to her husband on the basis of her signature and she had a direct interest in the extension," *citing State Bank of Arthur v. Sentel*, 10 Ill.App.3d 86, 91, 293 N.E.2d 444, 448 (1973).

Thus, whether sufficient consideration flows to a wife for credit extension of credit to her husband depends on whether the credit was extended in reliance on her signature or guaranty. In *H. Watson*, there was absolutely no evidence that the signature of the wife was relied upon for the extension of credit. In this case, Ford Credit has provided an affidavit evidencing its reliance upon Esther Fitzgerald's signature for the extension of credit to her husband's dealership. However, the evidence relied on by Mrs. Fitzgerald may create a question of fact on this issue, which the Court is reluctant to resolve on summary judgment. The Court therefore denies summary judgment with respect to Esther Fitzgerald's guaranty on this basis only.

However, since no genuine issue of material fact has been raised by Harold DeValk, June DeValk, or John Fitzgerald, and Ford Credit has demonstrated that it is entitled to judgment as a matter of law on their guaranties, the Court grants Ford Credit's

motion for summary judgment on Count II with respect to these three defendants.

### Attorney's Fees

The only remaining issue raised by defendants pertains to attorneys fees. Under the Wholesale Financing and the Capital Loan agreements, and the individual guaranties, the Dealership and the individual defendants agreed to pay reasonable attorney's fees incurred by Ford Credit in the collection of the debts owed it. Ford Credit is therefore entitled to reasonable attorney's fees for any debts found collectable by the Court.

Ford Credit has submitted two affidavits stating amounts of expenses and attorneys fees expended in this matter. The defendants object to the attorneys fees claimed by Ford Credit on the basis that it merely states a total amount of fees without any break-down of the types of services provided or the rates charged. Since, without a statement specifying the legal services provided and the fees charged, the defendants are unable to effectively challenge the reasonableness of the fees, the Court hereby reserves judgment on the question of attorneys fees, and orders Ford Credit to submit a detailed hourly statement of the services provided and the fees charged so that the reasonableness of the fees requested can be determined.

### Conclusion

Since some matters remain unresolved, the Court defers entering specific money judgments against the various defendants at this time until the next status hearing.