**TRW TITLE INSURANCE COMPANY, Plaintiff,**

v.

**SECURITY UNION TITLE INSURANCE COMPANY, Defendant/Third Party Plaintiff,**

v.

**LIBERTY NATIONAL TITLE INSURANCE COMPANY, d/b/a Liberty Title Insurance Company and Edward G. Wells, Third Party Defendants.**

**No. 93 C 7555.**

United States District Court, N.D. Illinois, Eastern Division.

May 3, 1995.

William J. Holloway, Michael John Leech, William G. Swindal, Marcos Reilly, John Raymond Rapasky, III, Robert Hill Smeltzer, Hinshaw & Culbertson, Chicago, IL, for TRW Title Ins. Co.

Barrie Laine Brejcha, William Michael Sneed, Thomas Anthony Doyle, Adriane Worthington Burkland, Baker & McKenzie, Chicago, IL, for Security Union Title Ins. Co.

Gary W. Leydig, James E. McParland, Gerald Haberkorn, Levin, McParland, Phillips, Leydig & Haberkorn, Chicago, IL, for Liberty Nat. Title Ins. Co.

Edward Wells, Palatine, IL, pro se.

### MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Plaintiff, TRW Title Insurance Company ("TRW"), and defendant, Security Union Title Insurance Company ("Security"), are title insurers.[1] From 1984 to February, 1990, Security had an agreement with Liberty National Title Insurance Company ("Liberty") whereby Liberty acted as Security's title insurance agent.[2] In December, 1989, TRW entered into an agreement with Liberty under which Liberty acted as TRW's title insurance agent. Liberty administered an escrow fund to assist in the closing of the real estate transactions for which it issued title insurance.[3] In February, 1991, TRW became aware that the Liberty escrow account was underfunded. TRW ultimately provided over $3 million to cover the shortage in the escrow fund. TRW filed the present lawsuit, seeking recovery from Security for the deposits it made into the Liberty escrow account. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332. On May 13, 1994, Judge Hart denied in relevant part Security's motion to dismiss, permitting TRW to pursue its fiduciary duty, common law fraud, breach of contract and unjust enrichment claims against Security. Security now seeks summary judgment on all of these claims.

### Undisputed Facts

TRW is a Kansas corporation, and its principal place of business is Kansas. Security, formerly known as Safeco Title Insurance Company, is a California corporation with its principal place of business in Illinois. Liberty, now known as Strategic Mortgage Services of Illinois, Inc. and doing business as Liberty Title Insurance Company, is an Illinois corporation having its principal place of business in Illinois. Edward G. Wells ("Mr. Wells"), an Illinois citizen, owned all of Liberty's stock from 1989 to 1990.

Liberty and Security entered into an Issuing Agency Agreement ("Agency Agreement") in November, 1993. The Securi-

---

**1.** Title insurers offer title insurance policies on real estate to provide assurance to the purchaser of the real estate and/or the purchaser's lender that marketable title is being acquired.

**2.** Title insurers contract with title insurance agents for the agents to determine the status and insurability of title and issue the title insurer's policy pursuant to a written policy issuing agency contract.

**3.** In addition to issuing title insurance, title agents offer escrow services for closings of real estate transactions. Closing escrows are established by closing escrow agreements executed by the parties to the real estate transaction and the title agent. Upon satisfaction of the terms and conditions of the closing escrow agreement, the title agent disburses funds and releases documents deposited into escrow by the buyer and/or its lender and issues a title insurance policy to the buyer and/or its lender.

ty/Liberty agency was exclusive. Under the arrangement, Liberty provided closing escrow services, and Security issued escrow protection letters to mortgage lenders who did business with Liberty. An escrow protection letter is a promise by a title insurer to a mortgage lender doing business with the title insurer's title agent to reimburse the lender for actual losses it incurs in connection with the closing of a real estate transaction, provided that the real estate closing is conducted by the title insurer's title agent, and the mortgage lender's loss arises out of the title agent's failure to comply with the lender's written escrow closing instructions.

In February, 1988, Security sued Liberty and Mr. Wells, charging Liberty with failure to pay amounts owed under the parties' Title Plant Access Agreement,[4] fraud, tortious interference with contractual relations, and RICO violations.[5] The complaint did not contain any claim regarding Liberty's closing escrow account. The parties agreed to settle the lawsuit in November, 1989, by Liberty's paying $235,000 to Security. On December 28, 1989, Mr. Wells told Security that he had found another title insurer (TRW) for whom Liberty would act as title agent. After that, Liberty no longer wrote policies for Security. All of Security's escrow protection letters were revoked by January 2, 1990. On February 23, 1990, Security, Liberty and Mr. Wells signed the final papers formally settling the lawsuit and terminating the Agency Agreement. The settlement document contained a confidentiality provision.

The parties to the Security/Liberty lawsuit later discovered that certain drafts of the settlement documentation had been attached to motions filed in that lawsuit. Security filed a motion to seal those parts of the record containing draft settlement documents.

In December, 1989, TRW and Liberty agreed that Liberty would become TRW's title insurance agent. Before signing Liber-

ty as a title agent, TRW obtained an agency application from Liberty, spoke by telephone with two references provided by Mr. Wells and performed a credit check on Mr. Wells. TRW did not contact Security, even though TRW knew that Liberty had contracted with Security. In fact, between December 4, 1989 and February 23, 1990, TRW and Security had no contact with each other respecting Liberty.

Prior to contracting with Liberty, TRW did not communicate with either Liberty's bank, although it was listed on Liberty's agency application, or the title plant vendor Liberty used at the time. TRW did not investigate Liberty's escrow practices by auditing its escrow operations or by other means and did not audit Liberty. TRW did not contact state licensing authorities to obtain information about Liberty, interview Liberty's employees, or check court files or computer databases to see if Liberty had been involved in litigation.

In February, 1991, a little more than a year after TRW had replaced Security as the title insurer with which Liberty worked, a routine audit of Liberty's escrow account showed the account was underfunded. TRW claims that the Liberty escrow fund shortage was approximately $2.9 million as of December 4, 1989, and was approximately $3.1 million as of December 31, 1989. By May, 1991, TRW estimated that the amount of the shortage in the Liberty escrow account was approximately $4 million. TRW made up all losses to the escrow account, and at no time did any escrow transaction involving Liberty fail to close based on any shortage of funds. In the present lawsuit, TRW seeks to recover from Security for deposits it made into the Liberty escrow account totaling $3,390,-283.06.

### Discussion

#### A. *Standard of Review*

Summary judgment disposes of a claim before trial in instances where a trial is

---

4. A title plant contains information about the status of title to real property. Title agents seek access to title plants in the course of determining whether and on what terms to issue a title insurance policy on a particular parcel of real estate. Security's Title Plant Access Agreement with Lib-

erty authorized Liberty to use Security's computerized title plant in return for payment.

5. *Safeco Title Insurance Company v. Liberty National Title Insurance Company*, No. 88 C 1687, 1989 WL 11079 (N.D.Ill.).

unnecessary and can only result in delay and expense. *Ford Motor Credit Co. v. Devalk Lincoln–Mercury, Inc.*, 600 F.Supp. 1547, 1549 (N.D.Ill.1985). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R.CIV.P. 56(c). A genuine issue of fact exists when a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## B. *Fraud*

■ Security seeks summary judgment on TRW's claim for fraud. TRW explains its fraud theory as follows: Security knew that Liberty had been run dishonestly by its president, Mr. Wells, for "a long time" and sued Liberty for fraud. Through discovery and on-going audits, TRW learned more about that fraud. "From that information, [Security] could hardly help but know that Wells had stolen large amounts of money from Liberty's escrow account...." (Security Brief in Opposition to Summary Judgment, p. 2.) Rather than terminate the contract immediately, Security negotiated a settlement with Liberty that called for Liberty to obtain a new underwriter. In essence, knowing that Mr. Wells would lie, Security sent him out to obtain a new underwriter so that the new underwriter and not Security would be left to pay the massive shortages in the escrow account when Mr. Wells' Ponzi scheme collapsed. Id. at 3.

If the evidence supported TRW's theory, I would agree that a jury could find fraud. "[A] person who, by his conduct, contributes to the misapprehension of another as to a material matter, and intentionally fails to correct the misapprehension, is guilty of fraud." *Tcherepnin v. Franz*, 393 F.Supp. 1197, 1217 (N.D.Ill.1975) (citing Illinois cases). In addition, if the facts supported TRW's theory, Mr. Wells could be found to have been Security's agent for purposes of obtaining a new underwriter and protecting Security from the losses it would incur if it had to cover the shortages in the account.

All of this depends on knowledge by Security (or at least recklessness since that is often the equivalent of knowledge) that the escrow account in fact contained shortages. The suit by Security against Liberty and Mr. Wells did not allege shortages in the escrow account. TRW acknowledges that there is no direct evidence that Security knew of the shortages but says there is circumstantial evidence of knowledge. In this regard, TRW points to the fact that Security's auditor, Patricia Kendall, either never completed her audit of the account in December 1989 and January 1990 or never prepared a written report of the audit, although completion of the audit had been contemplated as a condition to settling the lawsuit between Liberty and Security. Still, the only evidence with respect to the findings of the audit is Ms. Kendall's deposition testimony that a negative balance in an escrow account would give her a suspicion that something was wrong. Contrary to TRW's argument, however, she did not actually testify that she thought the account was short.[6] She did testify that she did not prepare a written report of the audit because she was either told not to or never told to do so (the testimony is unclear), but that is not enough evidence to send a case to a jury on a claim of fraud. TRW also points to its expert's testimony which it says supports its claim that Security knew of the shortfalls. However, Gary Appuhn's written opinion states only that Ms. Kendall's workpapers "suggest a potential shortage ... which warranted further investigation and/or use of alternative auditing procedures to help quantify any shortfall which might have existed." (TRW Ex. 7 at 1.) That opinion suggests possible negligence, but it is not enough for fraud.

The remaining evidence relied on by TRW in support of its fraud claim relates to the proceedings in the case between Security and Liberty. At various times before the settlement was finalized, Security attorneys stated that they wanted an audit of the escrow account. They point to no evidence, however, that this was anything more than a normal practice or ordinary prudence in terms of terminating the relationship between Lib-

---

6. TRW attached only a few pages of the deposition to its exhibits in support of the motion for summary judgment. I can only go by what is included in the record.

erty and Security. They also attach significance to the fact that a draft of a settlement agreement had contained a requirement that Liberty obtain a new underwriter. That requirement was taken out of the final document, although of course Liberty did find a new underwriter, but that again is not shown to be tied to knowledge of an escrow shortfall as opposed to a general desire not to deal with Liberty and Mr. Wells in the future. Finally, TRW points to the fact that the settlement agreement contained a confidentiality provision, which even TRW admits is commonplace, but it relies on the statement of Liberty's counsel that Security allegedly was "horrified" when, by accident, drafts of the settlement agreement were placed in the public court file. Again, the connection between this testimony and fraud is completely speculative.

In short, if Security had knowledge of Liberty's escrow shortages during the relevant time period, TRW has failed to uncover it. Since there is no evidence of such knowledge, Security is entitled to summary judgment on TRW's fraud claim.

### C. *Subrogation*

■ Under Illinois law, the equitable doctrine of subrogation allows one who pays a debt for which another is liable to enforce rights that the payee could have enforced by collecting from the party who should have discharged the debt. *Aetna Casualty & Surety Co. v. Chicago Insurance Co.*, 994 F.2d 1254, 1257 (7th Cir.1993) (citing *Dix Mutual Ins. Co. v. LaFramboise*, 149 Ill.2d 314, 597 N.E.2d 622, 624, 173 Ill.Dec. 648, 650 (1992)). Although Illinois courts liberally apply subrogation principles, three requirements must be met: the subrogee must pay the debt in full; the subrogee must pay a debt for which the defendant is primarily liable; and the subrogor—the party who was paid—must possess a right enforceable against the defendant. *American National Bank and Trust Company of Chicago v. Weyerhaeuser Company*, 692 F.2d 455, 461 (7th Cir.1982).

■ It is undisputed that TRW fully made up the loss to the escrow account, and therefore, if TRW is considered to have paid a debt to a subrogor, the debt was paid in full.

Security argues that because a subrogation claim arises only if payment is made to an identifiable subrogor, by paying amounts to Liberty not earmarked for any specific mortgage lender, TRW did not pay a debt to any mortgage lender, or subrogor.

In his May 13, 1994, opinion, Judge Hart rejected Security's argument. Security relies on *City National Bank v. Chase Manhattan Bank*, 714 F.Supp. 927 (N.D.Ill.1989), in support of what in essence is a motion for reconsideration. In that case, the trustees of a profit sharing trust invested funds with Travelers, which Travelers was to disburse to the trust's participants upon the occurrence of certain events. Travelers placed money into an escrow account to reimburse participants whose money was embezzled and then sued as subrogee. *Id.* at 928. While the court ultimately held that Travelers had not satisfied all the requirements for subrogation, the court found that Travelers had paid in full the debt owed the subrogors. *Id.* at 929, 931. The case does not, therefore, support Security's position.

According to TRW, Liberty, during the time it acted as Security's agent, took money belonging to lenders backed by Security escrow protection letters from the escrow account and used it for its own purposes. TRW claims that as of December 4, 1989, when Security was Liberty's principal, the shortage in the escrow fund was approximately $2.9 million. Because of the shortfall, Liberty applied funds from later lenders to pay off earlier lenders, and as a result, Security avoided having to make payments to cover shortages for which it had provided letters of protection. Upon discovering the deficit, TRW was obligated to put money into the escrow account in order to prevent current lenders from having to advance new funds to permit their borrowers to close. If TRW can show that its lenders were in this position due to Liberty's stealing from the escrow fund during the time Security was its principal, I would conclude that Security was primarily liable for the debt paid by TRW and the lenders could have sued Security for it.

Security argues that TRW's subrogation claim must nevertheless be barred on account of inequitable conduct on the part of TRW. The inequitable conduct assertedly is that TRW "stole" Liberty from Security. Security has offered no case authority to support its claim that TRW could have acted improperly in obtaining an agent that it wanted to be rid of. Furthermore, the undisputed evidence is that TRW was told this fact (although not the reason why) by Liberty before TRW and Liberty entered into a contract.

In summary, there is enough evidence to create a question of fact as to whether, by depositing money into Liberty's escrow account to make up the loss caused by Liberty's theft, TRW paid a debt for which Security is primarily liable and the mortgage lenders could have sued Security. Security's motion for summary judgment on TRW's subrogation claim is denied.

### D. *Breach of Fiduciary Duty*

 Co-trustees are jointly and severally liable for breaches of trust. Bogert, THE LAW OF TRUSTS AND TRUSTEES § 701 at 195–96 (2d rev. ed. 1982); RESTATEMENT (Second) OF TRUSTS § 258 (1959). There is an issue of fact as to whether TRW and Security were co-trustees of Liberty's escrow account from December 4, 1989, the date TRW entered into the agreement with Liberty, to February 23, 1990, the date the Security/Liberty agreement ended. TRW's expert says that during that time period, there was a shortage in the escrow account. TRW made up that shortage by depositing funds into the escrow account. The facts before the Court support TRW's claim that it is entitled to recover money from Security as its co-fiduciary. Security's motion for summary judgment on TRW's breach of fiduciary duty claim is therefore denied.

### *Conclusion*

For the foregoing reasons, Security's motion for summary judgment is granted in part and denied in part.