**CONTRAIL LEASING PARTNERS, LTD., Plaintiff-Appellee, Cross-Appellant,**

v.

**CONSOLIDATED AIRWAYS, INC., Defendant-Appellant, Cross-Appellee.**

No. 83–2543, 83–2775.

United States Court of Appeals, Seventh Circuit.

Argued May 10, 1984.

Decided Aug. 31, 1984.

Rehearing Denied Oct. 5, 1984.

Vincent J. Heiny, Snouffer, Haller & Colvin, Fort Wayne, Ind., for defendant-appellant, cross-appellee.

Before POSNER and COFFEY, Circuit Judges, and KELLAM, Senior District Judge.[*]

POSNER, Circuit Judge.

This diversity suit, which the parties agree is governed by the Uniform Commercial Code as codified in Indiana, raises a number of questions regarding a secured creditor's right to repossess and sell his collateral on the debtor's account.

In 1976 Consolidated Airways, Inc. sold a Grumman Gulf Stream commercial aircraft to Contrail Leasing Partners, Ltd. for $575,000–$60,000 down and the rest to be paid in monthly installments. Consolidated took back a chattel mortgage on the plane. Beginning with a missed payment in May 1978 Contrail defaulted, and in July Consolidated repossessed the plane and began trying to sell it to realize the unpaid balance on the mortgage. Consolidated made a deal to sell the plane to Emerald Airlines for $675,000, and on August 31 it sent Contrail a telegram notifying it that the sale would take place on or about September

ber 5. Even though it had referred Emerald to Consolidated in the first place, Contrail notified Emerald that it objected to the sale; and fearing that the sale would become entangled in legal proceedings, Emerald backed out. Later the plane required substantial maintenance work which included rebuilding its propellers to comply with the Federal Aviation Administration's safety requirements. The work cost Consolidated a little more than $26,000. When the work was completed Consolidated notified Contrail (on March 23, 1979) that it planned to sell the plane at a public auction in two and a half weeks (April 9). Contrail brought this suit on March 26, before the sale, and moved for a preliminary injunction to prevent the sale. The motion was denied, and on April 6 Contrail filed a notice of *lis pendens* (litigation pending) with the FAA. At the sale, held as scheduled on April 9, Consolidated was the only bidder. It bid $515,000 for the plane, and became the owner. Contrail got nothing from the sale, because the sale proceeds were less than the sum of the unpaid balance of the mortgage plus various expenses that Consolidated claimed.

Contrail's case came on for trial. Fifteen months after the two-day trial ended, the district judge issued his opinion. In it he found that the sale had been commercially unreasonable and that the plane had been worth $625,000 on the day of the sale (to which had to be added the $38,000 that Consolidated had earned from leasing the plane during the period of repossession), and he concluded that Contrail was entitled to the difference between (1) the sum of these figures ($663,000) and (2) the amount owed to Consolidated on its mortgage plus the expenses Consolidated had incurred in the sale. The difference, as the judge calculated it, was $133,000, and he entered judgment for Contrail for that amount. Consolidated has appealed on the ground that $133,000 is too much, and Contrail has cross-appealed on the ground that it is too

[*] Hon. Richard B. Kellam of the Eastern District of Virginia, sitting by designation.

little because the plane was worth more than $625,000 on the date of the sale.

■ A creditor who, having repossessed the debtor's goods, sells them to satisfy his debt is entitled to retain so much of the proceeds of the sale as is necessary to pay off the debt. See UCC § 9–504, Ind.Code § 26–1–9–504. If he has incurred reasonable expenses in preparation for the sale he is entitled to deduct those as well. See UCC § 9–504(1)(a), Ind. Code § 26–1–9–504(1)(a). The district judge recognized this principle and therefore allowed Consolidated to deduct various expenses, but he misapplied the principle in two respects:

1. He did not allow Consolidated to deduct the interest that had accrued on the note secured by the chattel mortgage between the date of default, May 17, 1978, and the date of the sale, April 9, 1979. The unpaid principal on May 17, 1978, was $403,056.90, and the note called for interest at the rate of one percent a month. The district judge did not explain why he had not credited Consolidated with this interest. Contrail conjectures that he meant to penalize Consolidated for its improper conduct regarding the sale, of which more presently. But there is no indication that this was what was in the judge's mind. Contrail had argued that Consolidated's behavior was so egregious as to entitle Contrail to punitive damages, and there is support in Indiana law for awarding punitive damages "where the debtor can clearly show that the secured party is intentionally and maliciously violating the rights of the debtor." *Hall v. Owen County State Bank*, 175 Ind.App. 150, 160 n. 10, 370 N.E.2d 918, 927 n. 10 (1977). But Contrail's request for punitive damages was turned down because the judge could find no malice or willfulness or other circumstances of aggravation in Consolidated's behavior. His opinion offers no ground for lopping off part of Consolidated's claim. His action is made more difficult to understand by the fact that he (quite properly) credited Contrail with the $38,000 that Consolidated had earned from leasing the plane

during the period of repossession. Consolidated was able to generate that income for the debtor only because it had possession of the plane, and one of the costs of possession to Consolidated was going without the $403,000 that the debtor owed it. It was an opportunity cost, which is a real cost in law as in economics. See, e.g., *Simmons v. United States*, 698 F.2d 888, 898 (7th Cir.1983). Consolidated is entitled to recover that opportunity cost by charging interest for the period of repossession.

■ There is no suggestion that one percent a month for the 10 months of the repossession was an unreasonable charge for Consolidated's money; and it is not clear that it would make a difference if it were (provided it was not usurious). Though we have treated the interest as an expense of the creditor, it is more appropriately regarded as a part of the underlying debt (but it makes no difference which it is). The debt was unpaid principal plus one percent interest for every month the principal was unpaid; and it was the principal plus accrued interest that Consolidated was entitled to keep along with expenses when it sold the plane on August 9, 1979. Alternatively, the one percent a month can be viewed as prejudgment interest to which Consolidated was entitled under well settled principles illustrated by *Indiana Telephone Corp. v. Indiana Bell Telephone Co.*, 171 Ind.App. 616, 634–35, 358 N.E.2d 218, 229 (1976), modified, 171 Ind.App. 638, 360 N.E.2d 610 (1977), since the principal was a definite amount and Contrail does not deny that one percent was the reasonable rate of interest in the circumstances.

■ 2. Another cost incurred by Consolidated during the period of repossession was the money that it spent to rebuild the propellers. Some of the language in the district judge's opinion makes it appear that he intended to allow Consolidated that expense, but we are unable to find such an allowance in his final computation. The question is not, as Contrail would have it, whether the expense was necessary to keep the plane from being grounded, though there is much evidence that it was; the

question is whether it was prudent. See UCC § 9–504(1)(a), Ind.Code § 26–1–9–504(1)(a). A prudent expenditure could be expected to be reflected in the value of the plane at the date of sale. The plane the district judge valued at $625,000 as of April 9, 1979, was a plane with rebuilt propellers; and it is not suggested that Consolidated paid more to rebuild them than was necessary. Since Contrail was the beneficiary of the expenditure, Consolidated was entitled to deduct it from the proceeds that it paid over to Contrail.

If, pursuant to the parties' stipulation which was erroneously copied by the district court, we correct the principal amount on the date of the default to $403,056.90, and if we then add: $43,395.65, which is interest at one percent a month during the repossession period; $26,143.77, for the propeller work (on which interest is not sought); and finally the expenses (including a prior lien) allowed by the judge, which came to $122,649.67, then the grand total of what Consolidated should have been allowed to keep from the sale is $595,245.99—not, as the judge thought, $529,514.87. From this should be deducted the $38,000 in lease income that Consolidated earned on Contrail's account during the repossession period, for a net due Consolidated of $557,245.99.

Further adjustments to this figure, relating to the issue of brokerage expense, will be considered later; but accepting its accuracy for the moment, one can see that if the sale was commercially reasonable, then since it yielded proceeds ($515,000) smaller than the amount due Consolidated, Contrail is entitled to nothing and Consolidated is entitled to the deficiency judgment it sought in a counterclaim that the district judge dismissed. But if the sale was commercially unreasonable, it becomes necessary to calculate the fair market value of the plane on April 9, 1979, and if that fair market value was more than what is due Consolidated, Contrail is entitled to the excess, plus (it is undisputed) interest since April 9, 1979.

"A sale is commercially reasonable where it is done in public, during business hours, upon adequate notice within a reasonable time of repossession, and under conditions reasonably calculated to bring a fair market price." *Personal Jet, Inc. v. Callihan,* 624 F.2d 562, 568 (5th Cir.1980); see UCC § 9–504, Ind.Code § 26–1–9–504; White & Summers, Handbook of the Law Under the Uniform Commercial Code § 26–11 (2d ed. 1980). The judge was entitled to find that the sale on April 9, 1979, was not commercially reasonable, because adequate notice was not given. Although Consolidated offered testimony that it gave notice of the sale orally to all major airplane brokers in the United States, the judge disbelieved this testimony, and we cannot say he was clearly wrong to do so. So far as appears, all Consolidated did in the way of notice was to place an inconspicuous ad in one publication of the used-aircraft trade (the second ad in that publication, which ran *after* the sale, does not count). There was testimony that a serious effort to interest potential buyers would have required a more conspicuous ad plus advertising in other trade publications as well. The fact that no one showed up for the sale except Consolidated is consistent with the fact that Consolidated made little effort, on this occasion anyway, to sell the plane. It may have been quite content to buy the plane from itself at a bargain price that would wipe out Contrail's equity in it.

Against all this, Consolidated argues that Contrail should be estopped to protest the sale because of its having broken up the first sale to Emerald at a much higher price and having filed a notice of *lis pendens* on the eve of the second sale. But whether or not Contrail acted unreasonably on either occasion, its conduct could not justify Consolidated in not conducting a fair sale. Pushed to its logical extreme, Contrail's argument implies that if Consolidated at the "public" auction had sold the plane to itself for one cent, Contrail still could not protest. Consolidated did not do that, but it did set a price that wiped out Contrail's entire equity in the plane. So drastic a forfeiture as is implied

by the proposition that Contrail should be estopped to challenge an unreasonable sale is not necessary to protect the creditor from misbehavior by the debtor. By breaking up the sale with Emerald Airlines, which would have been at a higher price than the district judge thought the plane was worth seven months later, and then filing a *lis pendens* calculated to reduce the competition that Consolidated would face in buying in at the second sale, Contrail—as we are about to see—hurt itself, and, provided it did not drive the market value below the debt (plus expenses) to Consolidated, only itself. If the costs of the debtor's misconduct falls on the debtor, it is not necessary also to decree forfeiture of his entire equity, which is the sanction that Consolidated is proposing.

Although the sale was unreasonable, and Contrail was therefore entitled to the fair market value of the plane on the day of sale (minus whatever was due Consolidated), we do not think the district court's valuation of $625,000 can be sustained. True, there was some basis for this figure, even though in arriving at it the district court applied a pretty stiff discount to the $675,000 price for which Consolidated had agreed to sell the plane to Emerald Airlines ten months earlier—a price agreed on, moreover, before the extensive repair work that Consolidated undertook. But the testimony showed that the market for used Grumman Gulf Stream commercial aircraft is rather thin, and the fact that Emerald was willing to pay a high price in 1978 doesn't prove that anyone would have been willing to pay as high a price a year later—in 1982 Consolidated sold the plane for only $616,000. There was also testimony that similar Grumman Gulf Stream aircraft were sold during the late 1970's in the $400,000's, though these planes were not in such good condition as this one.

Although $625,000 may seem a fair if rough average of the various figures, it has three problems:

1. We cannot ignore Consolidated's argument that the relevant value is that of a plane against which a *lis pendens* has been filed, although the judge ignored the argument in his opinion. (The fact that the opinion was written so long after the trial may explain why several issues were not discussed.) Contrail cannot walk away from the consequences of having filed a notice of *lis pendens* on the eve of sale. It had no valid reason to try to block the sale. It had an adequate remedy at law against Consolidated—the remedy it is pursuing in this case—if Consolidated failed to sell the plane in a commercially reasonable manner; for there is no suggestion that Consolidated is not good for any money it may owe Contrail. The only effect of filing the *lis pendens* was to make it less likely that a sale would command a good price. But it is not true, as Consolidated suggests, that the filing of the *lis pendens* drove the value of the plane to zero because no one but a creditor would pay for a plane so marked. When three years after the sale to itself Consolidated sold the plane for $616,000 the *lis pendens* was still on file—as it was when this case was argued. But on remand the district judge must make findings on the effect of the *lis pendens* on the plane's fair market value on the date of sale.

2. The judge did not explain why he gave no weight to two $750,000 offers for the plane made to Consolidated in or around March 1979. Although the complete terms of these offers are not in the record, the existence of the offers required the judge to explain why he chose the figure of $625,000, which was considerably lower. He may have a good explanation—the *lis pendens* perhaps, for it is unclear whether the offerors knew about it.

3. A point that cuts in the opposite direction—that suggests that $625,000 may have been too high an estimate—is that the judge did not (so far as appears anyway) allow for brokerage expense, which would have reduced the net proceeds of the sale to Contrail. In the aborted sale to Emerald Airlines, Consolidated had agreed to pay Emerald's broker a $35,000 commission, which works out to a shade over five percent. If Consolidated had found a buyer

on April 9 at a price of $625,000, it might have had to pay a similar commission to that buyer's broker. The net proceeds from the sale would therefore have been less than $625,000. It makes no difference whether we say that the relevant market value was 95 percent of $625,000 (assuming a commission of five percent), or that it was $625,000 but that Consolidated is entitled to deduct a five percent brokerage commission as an expense of a commercially reasonable sale. In either event an additional adjustment is necessary. But we do not know what the adjustment should be.

Errors 2 and 3 could be offsetting. If the proper brokerage fee is five percent, and if the judge by disregarding the offers that Consolidated received in March 1979 undervalued the plane by five percent, then his estimate of $625,000 would be unchanged. But these are guesses. We do not know either percentage—or the bearing of the *lis pendens*. We do not even know whether the judge's valuation was net of brokerage—which leads to a further complication:

4. Consolidated may have been permitted to deduct certain expenses incurred in its sale to itself that it would not have incurred had it used a broker, in which event there would be double counting if it were allowed to deduct brokerage expense as well. Official Comment 2 to UCC § 9–507 states that the secured creditor is not required to resell the collateral at retail rather than wholesale. Although it is true that Indiana has not enacted the official comments, as some states have, see, e.g., *Piper Acceptance Corp. v. Yarbrough*, 702 F.2d 733, 735 (8th Cir.1983) (Arkansas), no negative inference can be drawn; and even without the comment, it is pretty clear that section 9–507 does not require sale in a retail market. It provides that if the creditor "sells the collateral in the usual manner *in any recognized market therefor* ... he has sold in a commercially reasonable manner." § 9–507(2), Ind.Code § 26–1–9–507(2) (emphasis added). Wholesale markets are recognized markets for most goods, including aircraft, as we know from the *Piper* case; and an ironclad rule against selling collateral at wholesale rather than retail would make no sense. Although retail prices tend to be higher than wholesale prices, this is because it costs more to sell at retail. Not only can there be, therefore, no presumption that the net gains to the seller are different at the two levels, but economic theory implies that returns at the two levels will tend toward equality, since until they are equalized dealers will have incentives to enter at the level where the higher returns are being earned and by entering will bid those returns down.

So the important thing is to match expenses with estimated value correctly. If the judge estimates a retail price, there should be a deduction for brokerage if retail sales of airplanes normally are made through brokers but not a deduction for expenses of a sale at wholesale; but if he estimates a wholesale price, then only the expenses associated with wholesale sales should be deducted.

To sum up, a remand is necessary to permit the district judge to clarify his findings. He must on remand reestimate the value of the plane (with the *lis pendens*) on April 9, 1979; specify whether that is a retail or a wholesale price; subtract from that price all pertinent expenses of sale, which we said earlier amounted to $557,245.99—but the figure may have to be adjusted if the judge estimates a retail rather than a wholesale price; and award Contrail what is left after the subtraction, plus interest from April 9, 1979.

No costs will be awarded in this court, and Circuit Rule 18 shall not apply on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.