EASTERBROOK, Circuit Judge,
concurring.
This case involves the meaning of “value” under 11 U.S.C. § 547(c)(5). I join the court’s opinion, which concludes that the statute does not require bankruptcy judges to use one universal definition. The history of condemnation litigation shows that a single definition of “value” is not within judicial grasp. Still, we need not leave bankruptcy judges and litigants adrift. Security interests must be appraised with some frequency in bankruptcy litigation. The greater the uncertainty in the legal rule, the harder it is to settle pending cases. “Anything goes” is not a durable rule. The parties cannot know their entitlements until bankruptcy, district, and appellate courts have spoken. One important function of appellate courts is to provide additional clarity, when that is reasonably possible. It is possible here. The bankruptcy judge did better than to avoid an abuse of discretion. He decided the case correctly.
“Value” is defined for a purpose, which sets limits on the admissible standards of appraisal even though it does not govern all cases. Section 547(c)(5) requires the court to find whether the secured creditor *92 improved its position at the expense of other investors during the 90 days before the filing of the petition in bankruptcy. This calls for two appraisals, one on the day of filing and one 90 days earlier, using the same method each time, to see whether there was an improvement in position. The only standard that might plausibly be used in this case is wholesale cost of goods, because that is the only standard that could have been applied on both dates.
Wholesale cost is also the appropriate standard as a rule because wholesale and retail goods are different things. A furniture store, a supermarket, or the manufacturer of a product (the three situations are identical) uses raw materials purchased at wholesale to produce a new item. In the retailing business the difference between the wholesale price and the retail price is the “value added” of the business. It is the amount contributed by storing, inspecting, displaying, hawking, collecting for, delivering, and handling warranty claims on the goods. This difference covers the employees’ wages, rent and utilities of the premises, interest on the cost of goods, bad debts, repairs, the value of entrepreneurial talent, and so on. The increment of price is attributable to this investment of time and other resources. The Bank does not have a security interest in these labors. It has an interest only in its merchandise and cash on hand.* The value of its interest depends on what the Bank could do, outside of bankruptcy, to realize on its security. See Thomas H. Jackson, Avoiding Powers in Bankruptcy, 36 Stan.L.Rev. 725, 756-77 (1984). What it could do is seize and sell the inventory. It would get at most the wholesale price — maybe less because the Bank would sell the goods “as is” and would not offer the wholesaler’s usual services to its customer. The Bank does not operate its own furniture store, and if it did it would still incur all the costs of retailing the goods, costs that would have to be subtracted from the retail price to determine the “value” of the inventory on the day the Bank seized it. Cf. Contrail Leasing Partners, Ltd. v. Consolidated Airways, Inc., 742 F.2d 1095, 1101 (7th Cir.1984); Uniform Commercial Code § 9-504(l)(a).
To give the Bank more than the wholesale value is to induce a spate of asset-grabbing among creditors, which could make all worse off. If the Bank gets the whole increment of value (from wholesale to retail) during the last 90 days, other creditors may respond by watching the debtor closely and propelling it into bankruptcy when it has a lower inventory (and therefore less “markup” for the Bank to seize). The premature filing may reduce the value of the enterprise. There are other defensive measures available to creditors. The principal function of § 547(c)(5) is to reduce the need of unsecured creditors to protect themselves against the last-minute moves of secured creditors. It would serve this function less well if goods subject to a security interest were appraised at their retail price.
Too, the Bank’s security interest does not reach the “going concern” value of the debtor; it had security in the goods, not in the firm. To value the inventory in a way that reflects “going concern” value is to give the Bank something for which it did not contract. At all events, this wrinkle does not make a difference. If Ebbler had been sold as a going venture 90 days before the filing of the bankruptcy petition, the buyer of the business would have paid only wholesale price for Ebbler’s inventory. If Ebbler had been at the peak of health, the buyer would have paid no more for inventory. A buyer would not have paid retail, because it would have had to invest the additional time and money necessary to obtain the retail price. So whether Ebbler is valued as a defunct business or as a *93 going business sold to a hypothetical buyer on the critical date, wholesale is the right valuation, because it reflects the price that a willing buyer would pay after arms’length negotiation. (The “going concern” value of Ebbler is reflected in its name, reputation, customer list, staff, and so on— things in which the Bank did not have a security interest.)
To put this differently, a willing buyer of a flourishing retail or manufacturing business will not pay more than the wholesale price for inventory of goods or parts on hand, because this buyer could purchase the same items on the market from the original sellers. Why pay Ebbler $500 for a sofa when you can get the same item for $200 from its manufacturer? Nothing would depend on whether Ebbler planned to stay in business. The court therefore properly does not allow the outcome of this case to turn on the fact that Ebbler chose a Chapter 7 liquidation rather than a Chapter 11 reorganization. Chapter titles are of little use in valuing assets under § 547(c)(5). A “liquidation” may be a sale of the business en bloc as an ongoing concern, and a “reorganization” may be a transition from one line of business to another.
The difference between the wholesale and retail prices of the inventory is the compensation that the other factors of production — the employees, landlords, utilities, etc. — obtain for their, services. To appraise Ebbler’s inventory at “retail” is to award to the Bank the entire value of the work done during the last 90 days by these other creditors of Ebbler. It is to allow the Bank to improve its position at their expense. Because a valuation at “retail” would produce exactly the . consequence that § 547(c)(5) is designed to avert, the bankruptcy court wisely chose to appraise the goods at wholesale. The court leaves to another day the question whether retail price is ever an appropriate measure of value under § 547(c)(5). The observation that the bankruptcy court has leeway, however, does not imply that the court’s discretion should be exercised without reference to the function of § 547(c)(5) and the limits of the security interest.

The Bank’s interest in the proceeds of sales is not the same as an interest in the whole retail price for unsold inventory. An ongoing financing arrangement provides for operating expenses, too, to come out of proceeds. The security interest on any given day covers only identified proceeds, an asset that is identifiable and significantly smaller than the wholesale or retail value of the entire inventory.