**FORD MOTOR CREDIT COMPANY,**
**Plaintiff-Appellee,**

v.

**James P. SOLWAY,**
**Defendant-Appellant.**

**No. 86–2995.**

United States Court of Appeals,
Seventh Circuit.

Argued April 15, 1987.

Decided Aug. 11, 1987.

Rehearing and Rehearing En Banc
Denied Oct. 9, 1987.

Fred Mattelin, Siemon, Larson, Mattlin & Purdy, Boca Raton, Fla., for defendant-appellant.

Aaron J. Kramer, Schiff Hardin & Waite, Chicago, Ill., for plaintiff-appellee.

Before POSNER and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

The appeal in this diversity case concerns issues of Illinois law relating to the sale of collateral by a secured party. Ill.Rev.Stat., Ch. 26, par. 9–504(3). Ford Motor Credit Company took possession of the inventory of a retail automobile dealership that was in default under a secured financing agreement. The inventory was sold at wholesale auctions to other dealers. Ford Motor Credit Company next filed this suit against the guarantor of the debt for the deficiency in the amount owed by the dealership. The district judge granted Ford Motor Credit Company's motion for summary judgment. The guarantor contends on appeal that Ford Motor Credit Company violated the Uniform Commercial Code by failing to give him reasonable notification of the sales and by failing to make a commercially reasonable disposition of the collateral. We will affirm.

I

James P. Solway ("Solway") was the president of Shoreland Ford, Inc. ("Shoreland"), a Ford dealership in Highland Park, Illinois. In his capacity as Shoreland's president, Solway signed a wholesale financing agreement ("Financing Agreement") with Ford Motor Credit Company ("FMCC") dated May 24, 1979.[1] The Financing Agreement, entitled "Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement," permitted Shoreland to draw on a secured line of credit with FMCC. The collateral for the credit was Shoreland's inventory and the proceeds from sales of that inventory. The Financing Agreement provided that, should Shoreland fail to pay promptly any

---

1. The facts given are undisputed. Some are deemed admitted by Solway because they were included in FMCC's "Statement of Material Facts as to Which There is No Genuine Issue" and Solway did not file a statement controverting them. Under Local Rule 12(f) of the Northern District of Illinois, "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." *See Newman-Green, Inc. v. Alfonzo-Larrain R.,* 612 F.Supp. 1434, 1436 n. 2 (N.D.Ill.1985).

We note also that we do not address here arguments that Solway has raised for the first time on appeal. *Libertyville Datsun Sales, Inc. v. Nissan Motor Corporation in U.S.A.,* 776 F.2d 735, 737 (7th Cir.1985).

sum due, FMCC could immediately take possession of the collateral and sell it at a private or public sale.

Section 9–504(3) of the Uniform Commercial Code, which Illinois has adopted, requires that when a secured creditor sells collateral he do so in a "commercially reasonable" manner. In view of this, the Financing Agreement provided:

Dealer further agrees that if Ford Credit shall solicit bids from three or more other dealers in the type of property repossessed by Ford Credit hereunder, any sale by Ford Credit of· such property in bulk or in parcels to the bidder submitting the highest cash bid therefor also shall be deemed to be a commercially reasonable means of disposing of the same.

Solway also signed a separate agreement to personally guaranty payment of Shoreland's debt to FMCC. In this "Continuing Guaranty" ("Guaranty"), dated June 19, 1979, Solway agreed to pay on demand all sums due to FMCC from Shoreland without FMCC being required first to proceed against Shoreland; Solway also agreed more specifically "to pay any deficiency established by a sale of ... security held with or without notice [to Solway]."

Shoreland failed to make payments due to FMCC. FMCC declared Shoreland in default on March 21, 1980. On April 3, 1980, FMCC took possession of Shoreland's inventory, which consisted of new and one-year-old untitled automobiles, vans, and trucks. Solway proposed to FMCC that he sell the inventory to consumers at a "tent sale," arguing that this would realize the most income from the collateral. FMCC declined Solway's proposal.

FMCC sent notice by certified mail to Solway and Shoreland that the vehicles would be sold "at a private sale, on or after" April 12, 1980. FMCC sent Shoreland's notice to the Shoreland address and Solway's notice to the address he listed on the Guaranty, 2050 Post Road in Northbrook, Illinois. By the time of mailing, however, Solway was employed at another dealership and no longer resided at the Post Road address. Employees of FMCC had been aware that Solway was employed at another dealership and had reached him there by telephone on other matters. Mail for the Shoreland dealership was forwarded to Solway's new place of employment.

FMCC sold the vehicles at the Arena Auto Auction, a private auction open only to retail dealers. At least fifty dealers attended each of the auctions at which the Shoreland inventory was sold. Since 1979, all vehicles repossessed from Ford dealers have been resold at the Arena Auto Auction. Other companies such as General Motors, Chrysler Corporation, Citicorp, Nissan Motors and various banks sell new and used vehicles through the Arena Auto Auction.

Dealers from the Chicago area and from other parts of the country attend the Arena Auto Auction. FMCC sold its vehicles at a weekly auction. Each week, FMCC sent advertisements with sales information concerning the upcoming auction to Ford dealers in the Chicago area. FMCC also telephoned about three hundred Ford and Lincoln-Mercury dealers in Illinois, Wisconsin, Iowa, Michigan, and Ohio in regard to the sale each week. Dealers are able to inspect and test drive the cars before they are auctioned.

FMCC's sales at the auction were supervised by one Larry M. Steiner, an FMCC Vehicle Merchandising Coordinator. Steiner testified in his deposition as to the way the auction was run and produced records as to the price each vehicle fetched, but he was unable to testify about other details of individual sales. Thus, he could not testify as to each vehicle sold how many bids were received, exactly how many dealers were present, what the upset price was, or the condition of the vehicle.

The proceeds from the auction sales did not cover the entire amount that Shoreland owed FMCC. FMCC filed this suit against Solway for the deficiency. The trial court granted summary judgment in favor of FMCC in the amount of $758,598.93, together with interest from September 30, 1985. Solway argues on appeal that FMCC's disposition of the collateral was not commercially reasonable and that the

notice to Solway of the sales did not meet the requirements of the UCC.

## II

Under the Uniform Commercial Code, when a secured party sells collateral after default, "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." Ill.Rev.Stat., Ch. 26, par. 9–504(3). "Commercially reasonable" is not an exact standard. The UCC permits the parties to set more precise standards: "[T]he parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable: [including] subsection (3) of section 9–504 ... which deal[s] with disposition of collateral." Ill.Rev.Stat., Ch. 26, par. 9–501(3).

The parties to the Financing Agreement in this case did set such a contractual standard. The contract provided that, if FMCC should solicit bids from three or more other dealers, any sale of collateral to the highest bidder would be deemed a commercially reasonable means of disposing of the collateral. The vehicles were offered for sale to the highest bidder at auctions attended by numerous retail automobile dealers, so FMCC met this contractual standard.

Solway does not argue that the contractual standard is invalid. He argues instead that it does not apply here because he was not a party to the Financing Agreement in his personal capacity; he signed it as president of Shoreland. Thus he was not personally bound as a party to that contract by the contractual standard for what would constitute a commercially reasonable disposition.

Solway did, however, sign the Guaranty in his personal capacity, about two months after signing the Financing Agreement as president of Shoreland. In the Guaranty, he promised to pay on demand all sums due to FMCC from Shoreland. He also agreed "to be bound by and on demand to pay any deficiency established by a sale of paper or security."

A guaranty is to be interpreted according to the standards that govern the interpretation of contracts in general; the court's task is to effectuate the intent of the parties. *Blackhawk Hotel Associates v. Kaufman*, 85 Ill.2d 59, 51 Ill.Dec. 658, 421 N.E.2d 166 (1981).

The Guaranty clearly contemplates reference to other sources to determine the obligations of Solway as guarantor. To determine if he was bound by the Guaranty to pay FMCC one would have to refer to the other agreements and to the accounts between Shoreland and FMCC. The Financing Agreement, which provided financing for the inventory of Shoreland and which Solway had signed as president of Shoreland, was certainly contemplated by the Guaranty. Determining whether a deficiency existed regarding the debt secured under the Financing Agreement would require reference to the Financing Agreement. For instance, no deficiency could exist until Shoreland was in default under the Financing Agreement. *National Bank of Austin v. First Wisconsin National Bank of Milwaukee*, 53 Ill.App.3d 482, 10 Ill.Dec. 633, 368 N.E.2d 119 (2nd Dist.1977). The Financing Agreement defined the events that would amount to default. The Financing Agreement also explicitly provided steps that FMCC could take to take possession of the collateral and sell it. It also set a standard for what would constitute a commercially reasonable disposition of the collateral, thus providing a means for FMCC to preserve its right to a deficiency. By agreeing "to be bound by and on demand to pay any deficiency," Solway thus agreed to be bound by the contractual standard for a commercially reasonable disposition, just as he agreed to be bound by the contractual standard for determining default.

In a nutshell, the Financing Agreement defined a standard for a commercially reasonable disposition, which is a prerequisite for a deficiency. FMCC met the contractual requirements spelled out by the Financing Agreement, thus establishing its right to a deficiency. Solway agreed to pay

"any deficiency." Therefore, he is liable to FMCC for the amount of the deficiency.

■ Even were Solway not bound by the standard in the Financing Agreement, the standard would be highly relevant to determining whether FMCC's disposition of the collateral was commercially reasonable. A "reasonableness" standard necessarily takes into account the particular circumstances surrounding the conduct to be evaluated. Where a security agreement deems a particular means of disposing of the collateral to be commercially reasonable, then compliance with that provision is strong evidence that the secured party's disposition of the collateral was commercially reasonable.

### III

■ The UCC generally requires a secured party to give notice to the debtor before disposing of collateral:

> Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.

Ill.Rev.Stat., Ch. 26, par. 9–504(3). A guarantor is considered a "debtor" and is thus entitled to notice. *Commercial Discount Corp. v. Bayer*, 57 Ill.App.3d 295, 299–300,

14 Ill.Dec. 647, 650, 372 N.E.2d 926, 929 (1st Dist.1978).[2]

In Illinois, if the secured party fails to give the debtor reasonable notification of the sale of collateral, there arises a rebuttable presumption that the value of the collateral sold was equal to the indebtedness. *First Galesburg National Bank and Trust Company v. Joannides*, 103 Ill.2d 294, 82 Ill.Dec. 646, 469 N.E.2d 180 (1984). The secured party can rebut the presumption by showing that the value of the collateral was less than the amount of the indebtedness and that the sale of the collateral was commercially reasonable. *Id.*

■ Under section 9–504(3), if the disposition of the collateral is to be by a "public sale," the secured party must send the debtor notice of the "time and place" of the sale; if by "private sale or other intended disposition," then the provision requires only notice of "the time after which" the disposition is to be made. The notice that FMCC sent to Solway provided that the disposition would be "at a private sale, on or after" April 12, 1980. It did not specify the place of the proposed sale. This would be insufficient if the sale at the Arena Auto Auction was a "public sale" for the purposes of section 9–504(3).

The UCC does not define the difference between a public and a private sale. The Illinois courts have not had occasion to create such a definition. The Illinois Code Comment to section 9–504(3) states, "A public sale under this subsection contemplates a sale by auction." That does not imply the converse, that every auction is necessarily a public sale.

---

**2.** We do not reach the question, whether under Illinois law a guarantor can, before default, validly waive his right to notice of sale of the collateral. Compare *National Acceptance Company of America v. Wechsler*, 489 F.Supp. 642, 647 (N.D.Ill.1980) ("[T]he Court does not believe that a guarantor's status as a debtor under 9–504(3) compels the conclusion that a guarantor may not waive the rights accorded thereunder."), with *Commercial Discount Corporation v. King*, 515 F.Supp. 988, 992 (N.D.Ill.1981) (rejecting holding of *Wechsler*).

Nor do we reach the question, whether the Arena Auto Auction is a "recognized market." Under section 9–504(3), notice of sale of the

collateral need not be sent to the debtor if the collateral "is of a type customarily sold on a recognized market." Under section 9–507(2), "If the secured party[ ] sells the collateral in the usual manner in any recognized market therefor ... he has sold in a commercially reasonable manner." The district court in this case and another district court have concluded that the Arena Auto Auction is a "recognized market." *Ford Motor Credit Company v. Devalk Lincoln-Mercury, Inc.*, 600 F.Supp. 1547, 1551 (N.D.Ill.1985). *See also Contrail Leasing Partners, Ltd. v. Consolidated Airways, Inc.*, 742 F.2d 1095, 1101 (7th Cir.1984).

The issue was explored in *Morrell Employees Credit Union v. Uselton,* 28 UCC Rptg. Serv. 269. (Tenn.Ct.App.1979). In that case, the Credit Union posted four notices on the grounds of the John Morrell Company that a repossessed automobile would be sold at a certain place and time. Only offers from members of the Credit Union would be entertained. A member informed the president of the Credit Union that he would pay $5,400 for the automobile. At the appointed time of the sale, the president of the Credit Union stood in the presence of a few people, announced the amount of the offer and asked if anyone would offer more. No one did. The car was sold to the bidder.

Because the UCC does not define "public sale" or "private sale," the court looked to the definition of "public sale" in comment C to section 48 of the Restatement of Security: "one to which the public is invited by advertisement to appear and bid at auction for the goods to be sold." The court held that the sale by the Credit Union was a "private sale," declining to equate " 'public' to 'members of the Morrell Employees Credit Union.' "

In this case, attendance at the Arena Auto Auction was limited to retail automobile dealers. FMCC directed its promotional efforts for the auctions only at Ford retail dealers. To term the auction a "public" sale would certainly not conform with the usual meaning of the word "public." In *Morrell's* terms, the public consists of more than retail automobile dealers. The public was not "invited by advertisement" to bid for the cars; FMCC directed its advertising only to Ford dealers. The public was not even permitted to attend the auction.

"The purpose of giving a debtor notice of a public sale is to provide him with the opportunity to gather with and bid in the presence of other potential purchasers, and to observe that the sale is conducted in a commercially reasonable manner." *General Foods Corporation v. Hall,* 39 Ill. App.3d 147, 349 N.E.2d 573, 577 (1st Dist. 1976). Thus the debtor must receive notice of where and when the public sale is to be held. Because the debtor is not entitled to participate at a private sale, by contrast, the secured party need only send him notice of the date after which the private sale is to be made. Had Solway attended the auction, he may have been able to participate, but only because of the fact that he was a retail automobile dealer. A debtor who was simply a member of the public would not have been able to participate in the sale. The fortuity that Solway might have been able to participate in the sale cannot change its character from a private to a public sale.

Solway also contends that even if the sale was a private sale, FMCC was required to give him separate notice of the date upon which each and every auction sale would be made, relying on *Spillers v. First National Bank of Arenzville,* 81 Ill. App.3d 199, 36 Ill.Dec. 477, 400 N.E.2d 1057 (4th Dist.1980). In *Spillers,* the secured party sent the debtor notice on March 7 that it had received a bid of $15,000 for the collateral, a crane, and would sell it at a private sale ten days after receipt of the notice. The debtor offered $16,000 for the crane. The secured party and the debtor entered into negotiations for a sale at this price, but failed to reach an agreement. The secured party sold the crane for $15,000 to the original offeror on April 22.

The court held that the secured party had failed to give reasonable notification of the sale. The court reasoned that because section 9–504 requires notification of the time after which "any" private sale is to be made, the secured party had a duty to "notify petitioner of all and every proposed private sale, or sales." *Spillers,* 400 N.E.2d at 1060.

The present case is distinguishable from *Spillers.* In *Spillers,* the proposed sale of which notice was given did not take place on the date given. Furthermore, after notice was given, the parties entered into negotiation for a different sale at a higher price. Thus, the sale that occurred was not the one for which notice had been given.

In the present case, FMCC simply informed Solway that the vehicles would be

sold at private sales after a certain date. This conformed to the requirement of section 9–504(3) that the secured party send notice of "the time after which any private sale ... is to be made." Unlike *Spillers,* here there were no subsequent events that made the information in the notice of sale inaccurate or misleading. The Illinois courts have already limited the holding of *Spillers* to the proposition that notice of the sale of collateral must not be misleading:

> '[In *Spillers*], we held the notice to be faulty, reasoning that the sale finally made was not the same one originally contemplated.' ... In the instant case, the sale, although held six months after the notice, was the same one originally contemplated. There was not a second sale of collateral or an intervening offer by the defendant. In the absence of these factors, we interpret Section 9–504(3) as requiring only one notice of the date after which one private sale of collateral will be held.

*Ford Motor Credit Company v. Jackson,* 126 Ill.App.3d 124, 81 Ill.Dec. 528, 466 N.E.2d 1330, 1332 (3rd Dist.1984) (quoting *Staley Employee Credit Union v. Christie,* 111 Ill.App.3d 165, 66 Ill.Dec. 805, 443 N.E.2d 731, 733 (4th Dist.1982)). *See also General Foods Corporation v. Hall,* 39 Ill.App.3d 147, 349 N.E.2d 573, 577 (1st Dist.1976) (notice of "public sale" misleading and inaccurate where actual sale held in a law office on the basis of anonymous bids at undisclosed amounts and where debtor not permitted to participate). The notice in this case was not inaccurate or misleading.

Finally, FMCC did not fail to send reasonable notification to Solway because it sent notice to him at an address where he no longer resided and to Shoreland at the Shoreland dealership, where Solway no longer worked. The mail for Shoreland was forwarded to Service Chevrolet, where Solway did maintain an office. On the Guaranty, Solway listed his home address, 2050 Post Road, Northbrook. He never notified FMCC that he had moved from this address. There is nothing in the record to indicate that FMCC was aware that his home address had changed in the year since he signed the Guaranty. FMCC thus acted reasonably in sending notice to a guarantor at the address he listed on the Guaranty. Under UCC § 1–201(38) (Ill. Rev.Stat., Ch. 26, par. 1–201(38)), "Send" means to mail "in the case of an instrument to an address specified thereon or otherwise agreed, or if there be none to any address reasonable under the circumstances."

IV

For the reasons stated, the judgment of the district court is

AFFIRMED.